Kizzy Morales **VELAZQUEZ,** et al., **Plaintiffs,**

v.

**ABBOTT LABORATORIES, Defendant.**

**Civil No. 11–1131 (FAB).**

United States District Court, D. Puerto Rico.

Oct. 30, 2012.

---

Enrique Peral–Soler, Enrique Peral Law Offices, P.S.C., San Juan, PR, Humberto Guzman–Rodriguez, Guzman & Rodriguez–Lopez, Guaynabo, PR, for Plaintiffs.

Mariana Negron–Vargas, Solymar Castillo–Morales, Jessica Hernandez–Sierra, Edgardo Colon–Arraras, Goldman Antonetti & Cordova, San Juan, PR, for Defendant.

**OPINION AND ORDER**

BESOSA, District Judge.

Plaintiffs Kizzy Morales–Vazquez[1] ("Morales") and Fernando Guzman–Merly ("Guzman") bring this diversity action on their own behalf and on behalf of their minor child F.J.G.M. against Abbott Laboratories, Inc. ("Abbott" or "defendant") for strict product liability and negligence. (Docket No. 1.)

Pending before the Court is the magistrate judge's Report and Recommendation (Docket No. 56), recommending that defendant Abbott's motion for summary judgment (Docket Nos. 44, 45 and 46.), be **GRANTED.**

## I. Background

### A. Procedural History

On February 4, 2011, plaintiffs Morales and Guzman (collectively, "plaintiffs"), on

their own and as parents of their minor child, F.J.G.M., filed a complaint against Abbott for negligence and strict product liability. (Docket No. 1.) Plaintiffs allege that they fed their infant Similac Go & Grow formula, which Abbott manufactured, promoted, and advertised. *Id.* at ¶¶ 9 & 12. They also contend that after F.J.G.M. ingested the milk, which was allegedly recalled by Abbott for possible contamination, their child began to have diarrhea, fever, and pain. *Id.* at ¶¶ 13 & 17. The child was allegedly admitted to Ryder Hospital and was eventually discharged with a diagnosis of acute gastroenteritis. *Id.* at ¶ 14.

On May 3, 2011, Abbott filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiffs failed to state a claim of negligence and strict liability under Puerto Rico law. (Docket No. 7.) On June 17, 2011, plaintiffs filed a response in opposition to the motion to dismiss, (Docket No. 11), and Abbott filed a reply to plaintiffs' response on June 21, 2011, (Docket No. 14).

Pursuant to a referral order issued by the Court, on September 30, 2011, 2011 WL 8194854, Magistrate Judge Camille Velez–Rive filed a report and recommendation ("R & R") regarding Abbott's motion to dismiss. (Docket Nos. 19 & 23.) The magistrate judge recommended that Abbott's motion to dismiss be denied. (Docket No. 23 at p. 10.) Both plaintiffs and defendant Abbott failed to file any objections. On March 26, 2012, the Court adopted the findings of the R & R in a Memorandum and Order. (Docket No. 28.)

On June 29, 2012, Abbott filed a motion for summary judgment, a statement of un-

---

1. Plaintiff Morales' surname is listed as "Velazquez" in the caption of the case, but both plaintiffs and defendant refer to her as "Kizzy Morales Vazquez" in their briefs. Therefore, the Court will use "Vazquez" as her second last name.

contested facts, and a memorandum in support of its motion for summary judgment. (Docket Nos. 44, 45, & 46.) Abbott argues (1) that plaintiffs fail to provide any expert testimony, which they allege is mandatory in this case; (2) that plaintiffs have not provided evidence from which a reasonable jury could find defect or causation; and (3) that plaintiffs have not provided any evidence that Abbott was negligent. (Docket No. 46.) On July 16, 2012, plaintiffs filed an opposition to Abbott's motion for summary judgment, (Docket No. 48), to which Abbott filed a reply on July 23, 2012, (Docket No. 51). On August 6, 2012, plaintiffs filed a sur-reply to Abbott's reply. (Docket No. 55.)

On September 26, 2012, the magistrate judge filed a R & R recommending that Abbott's motion for summary judgment be granted. (Docket No. 56.) The magistrate judge found (1) that the plaintiffs failed to introduce any expert testimony for its strict liability claim; and (2) that Abbott's recall notice for the powder milk formula, as well as the United States Food and Drug Administration's ("FDA") notices about Abbott's recall are inadmissible under Federal Rules of Evidence 403 and 407. *Id.* at pp. 13–23. Neither the plain-

tiffs nor the defendant filed objections to the magistrate judge's R & R. The Court addresses each of defendant Abbott's arguments and the magistrate judge's findings in turn.

## B. Factual Background

### 1. F.J.G.M's Hospitalizations and Abbott's Recall of its Similac Powder Milk

The relevant facts of the case are summarized here after applying Local Rule 56, which imposes requirements for the presentation of proof at summary judgment.[2]

Plaintiffs' child, F.J.G.M., was born in July 2009 and has suffered from health problems since birth. (Docket No. 46–3 at p. 16.) Initially, his pediatrician, Dr. Juan Vargas–Raposo ("Dr. Vargas"), recommended that his parents feed him a specific milk formula called Enfamil A.R., which is only given to patients who exhibit vomiting and reflux. (Docket No. 46–3 at pp. 39–40.) In July 2010, when F.J.G.M. was about one-year old, his parents switched him to the Similac Go & Grow formula, which is manufactured by Abbott, because Enfamil is only used for the first year of a

---

**2.** The First Circuit Court of Appeals has "repeatedly ... emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." *Hernandez v. Philip Morris USA, Inc.,* 486 F.3d 1, 7 (1st Cir.2007). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.'" *Id.* (quoting *Calvi v. Knox County,* 470 F.3d 422, 427 (1st Cir.2006)). Local Rule 56 sets out the requirements for both the movant and the party opposing summary judgment; it "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez–Toro,* 520 F.3d 58, 62 (1st Cir.2008); Loc. Rule 56.

A party moving for summary judgment must submit factual assertions in "a separate,

short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56(c). The moving party may reply and admit, deny, or qualify the opponent's newly-stated facts, again in a separate statement and by reference to each numbered paragraph. Loc. Rule 56(d). Facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); *P.R. Am. Ins. Co. v. Rivera–Vazquez,* 603 F.3d 125, 130 (1st Cir. 2010). Due to the importance of this function to the summary judgment process, "litigants ignore [these rules] at their peril." *Hernandez,* 486 F.3d at 7.

child's life. (Docket Nos. 46–1 & 48–8 at p. 33; Docket No. 46–3 at p. 39.)

On March 13, 2010, several months before he switched to the Similac formula, F.J.G.M. visited Dr. Vargas with a cough. He was diagnosed with an upper respiratory infection. (Docket No. 46–3 at pp. 20–21.) On July 29, 2010, about one month after F.J.G.M. began consuming the Similac formula, F.J.G.M. was taken to Ryder Memorial Hospital because he had nasal discharge and a fever. (Docket No. 46–3 at p. 45; Docket No. 46–5 at p. 8.) His throat and tonsils were inflamed, and he was prescribed several medications, including an antibiotic called Cephalexin. *Id.*

On August 10, 2010, F.J.G.M. visited the emergency room again, where he was diagnosed with an upper respiratory infection. (Docket No. 46–3 at pp. 46–47; Docket No. 46–5 at p. 9.) An x-ray taken the following day showed a viral respiratory infection and gastric distention-bloating of the stomach-from excessive swallowing of air. (Docket No. 46–3 at pp. 47–49; Docket No. 46–5 at p. 10.) About two weeks later, on August 31, 2010, F.J.G.M. visited Ryder Hospital again because of a cough. (Docket No. 46–3 at p. 49; Docket No. 46–5 at p. 11.) He was diagnosed with another upper respiratory infection. *Id.*

On September 15, 2010, Abbott detected warehouse beetles in its powdered milk while performing quality testing on an unreleased batch of Similac powdered milk at its Sturgis, Michigan facility. (Docket Nos. 46–8 & 18–10 at ¶¶ 6–8.) The Sturgis facility reported this finding to Abbott's headquarters, and it stopped all production

and shipment of its powder products the following day. *Id.* at ¶ 15. Despite extensive quality testings, Abbott had not previously detected warehouse beetles in its Similac powder milk product.[3] *Id.* at ¶¶ 11–14.

After the detection of warehouse beetles, Abbott tested 30,486 additional containers from twenty-two batches of its powdered milk. *Id.* at ¶ 16. To test the milk, Abbott liquified it and passed it through a sock filter with pores that were 200–micron (0.2 millimeters or 0.0079 inches) in size. *Id.* In the 30,486 containers tested, Abbott detected a total of forty-nine beetles, larvae, or parts; a rate of 0.16% of the milk tested was deemed contaminated. *Id.* Even though the tests showed that a very small percentage of the milk contained warehouse beetles or parts, on September 22, 2010, Abbott issued a voluntary recall of Similac powder products that were manufactured since September 2007 in the Sturgis facility because the shelf life of the powdered milk is up to three years. *Id.* at ¶¶ 6, 9–10 & 16.

Two days before the recall occurred, on September 20, 2010, plaintiffs took F.J.G.M. to the hospital again. (Docket Nos. 46–1 & 48–8 at pp. 26 & 37; Docket No. 46–3 at p. 50; Docket No. 46–5 at p. 12.) He had another upper respiratory infection. (Docket No. 46–3 at p. 52; Docket No. 46–5 at p. 12.) Plaintiff Morales also reported that the minor had diarrhea that would not stop, but the hospital emergency room record reflected that the "No" box was checked off next to "nausea, vomiting, diarrhea."[4] (Docket Nos. 46–1

---

**3.** Abbott employed a prominent third-party pest-control company to service its Sturgis facility on a regular basis and Abbott followed the company's advice for pest-control. (Docket Nos. 46–8 & 48–10 at ¶¶ 11–15 & 18–20.) An internal compliance audit performed from July 27 to August 3, 2010 and an inspec-

tion by the FDA in March 2010 found no significant problems with the Sturgis facility. *Id.* at ¶¶ 21–22.

**4.** Plaintiffs also state a number of other facts in their memorandum of law in opposition to Abbott's motion for summary judgement,

& 48–8 at pp. 27 & 30; Docket No. 46–5 at p. 12.) At that time, F.J.G.M. was taking Amoxil, an oral antibiotic used to treat the upper respiratory and tonsil infection. (Docket No. 46–3 at p. 52; Docket No. 46–5 at p. 12.) Dr. Vargas also indicated that the infant was "asymptomatic," meaning that he had no fever and that he was sent home with a regular diet. (Docket No. 46–3 at p. 52; Docket No. 46–5 at p. 12.) There was no order to stop taking the Amoxil and there were no other medications prescribed on this date. *Id.*

One day before the recall, on September 21, 2010, the infant had another chest x-ray taken. (Docket Nos. 46–1 & 48–8 at p. 29–30; Docket No. 46–3 at p. 54–55; Docket No. 46–5 at p. 13.) The x-ray suggested that F.J.G.M. had a viral type of pneumonia or an upper respiratory infection. (Docket No. 46–3 at pp. 55–56; Docket No. 46–5 at p. 13.) On September 22, 2010, the date of the Similac formula recall, plaintiffs took the infant to see Dr. Vargas. (Docket Nos. 46–1 & 48–8 at pp. 31–32; Docket No. 46–3 at p. 56; Docket No. 46–5 at p. 14.) Dr. Vargas indicated that he saw the results from the x-ray taken the day before. (Docket No. 46–3 at p. 56; Docket No. 46–5 at p. 14.) Dr. Vargas said that F.J.G.M. was suffering from diarrhea and was vomiting. (Docket Nos. 46–1 & 48–8 at pp. 31–32; Docket No. 46–3 at

pp. 56 & 60; Docket No. 46–5 at p. 14.) He told the plaintiffs to stop giving Amoxil to the infant because it might cause diarrhea.[5] (Docket No. 46–3 at pp. 57–58; Docket No. 46–5 at p. 14.) Instead of Amoxil, he prescribed a stronger antibiotic called Rocephin to F.J.G.M. *Id.* Dr. Vargas also admitted F.J.G.M. to the hospital on that date. (Docket No. 46–3 at p. 59; Docket No. 46–5 at p. 15.) F.J.G.M. was diagnosed with acute gastroenteritis with a secondary diagnosis of otitis—an ear infection—and moderate dehydration. (Docket No. 46–3 at pp. 61–62; Docket No. 46–5 at p. 17.)

At some point during this hospitalization, the plaintiffs learned about Abbott's recall from a television news show. (Docket Nos. 46–1 & 48–8 at pp. 41–42; Docket No. 46–7 at pp. 17–18.) The recall indicated that "there is a possibility that the infants who consume formula containing the beetles or their larvae could experience gastrointestinal discomfort and refusal to eat as a result of small insect parts irritating the GI tract." (Docket Nos. 8–5 & 48–6 at p. 2.) Plaintiff Morales went to Abbott's website to determine whether the can of Similac that she fed F.J.G.M. was part of the recall; she discovered that the formula was in fact a part of the recall.

(Docket No. 48), and in their opposition to Abbott's statement of uncontested facts, (Docket No. 48–1), and cite only to their complaint, (Docket No. 1), for support. The Court will not consider these bare assertions of fact in rendering its decision on defendant's motion for summary judgment. It is fundamental that plaintiffs may not rest on this type of allegations, uncorroborated by evidence, to overcome a properly supported motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that the non-moving party "may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts" to show the existence of a genuine issue of material

fact); *Serrano–Cruz v. DFI Puerto Rico,* 109 F.3d 23, 27 (1st Cir.1997) (finding that "to oppose [a] summary judgment motion, plaintiff cannot rely on assertions in [her] pleadings and must come forward with evidence that a jury could consider") (internal citation omitted).

**5.** Plaintiff also stated that on this date, Dr. Vargas told her to "stop the milk" but there is no indication of this in the hospital records or in Dr. Vargas' testimony about this visit. (Docket Nos. 46–1 & 48–8 at p. 38; Docket No. 46–3 at pp. 57–58; Docket No. 46–5 at p. 14.)

(Docket Nos. 46–1 & 48–8 at pp. 41–42; Docket No. 46–7 at p. 18.)

Plaintiff Morales testified that she had six more containers of Similac milk at her house.[6] (Docket Nos. 46–1 & 48–8 at p. 42.) While the infant was still hospitalized, plaintiff Morales sent her father to the supermarket to exchange all of the Similac cans for another brand of formula. (Docket Nos. 46–1 & 48–8 at pp. 46–47.) Plaintiff Guzman said that he did not examine the remaining cans of Similac formula in detail before they were returned to the supermarket. (Docket No. 46–7 at pp. 21–22.) Both plaintiffs also stated that they had not seen insects in the Similac formula that they fed to their infant. (Docket Nos. 46–1 & 48–8 at p. 50; Docket No. 46–7 at pp. 20–21.) Plaintiff Morales also testified that she called Abbott on the same day the infant was released from the hospital and was offered a refund check in the amount of $54.95. (Docket Nos. 46–1 & 48–8 at p. 45.) She does not remember, however, the name of the representative who she spoke to during the call, and she did not take any notes when she called. (Docket Nos. 46–1 & 48–8 at p. 42.)

On September 25, 2010, F.J.G.M. was discharged from the hospital. (Docket Nos. 46–1 & 48–8 at p. 40; Docket No. 46–3 at pp. 59–60; Docket No. 46–5 at pp. 15 & 17.) After the recall, plaintiffs stopped giving F.J.G.M. the Similac formula and switched to a different formula. (Docket Nos. 46–1 & 46–8 at p. 50.)

On October 26, 2010, the FDA issued an official press release,[7] which announced that Abbott had worked with state and FDA officials to correct the situation at the Sturgis facility and to prevent its reoc-currence. (Docket Nos. 8–3, 8–4, 48–4, & 48–5.)

On November 27, 2010, over two months after plaintiffs stopped giving F.J.G.M. the Similac formula, plaintiffs took F.J.G.M. to the emergency room with an ear infection in both ears, a throat infection, a cold, and a fever. (Docket Nos. 46–1 & 48–8 at p. 53; Docket No. 46–3 at pp. 74–75; Docket No. 46–5 at p. 19.) He was not hospitalized on that date. *Id.* On November 30, 2010, however, the infant was admitted to the hospital. *Id.* He had symptoms similar to those that had led to his September 2010 hospitalization: diarrhea, vomiting, and dehydration. (Docket Nos. 46–1 & 48–8 at pp. 56 & 58; Docket No. 46–3 at p. 77; Docket No. 46–5 at p. 22.) He was diagnosed with acute gastroenteritis, moderate dehydration, otitis, and tonsilitis. (Docket No. 46–3 at p. 76; Docket No. 46–5 at p. 20.) Another x-ray of F.J.G.M.'s lungs suggested that he might have a viral type of pneumonia. (Docket No. 46–3 at pp. 76–77; Docket No. 46–5 at p. 21.) F.J.G.M. stayed in the hospital until December 4, 2010. (Docket Nos. 46–1 & 48–8 at pp. 53 & 59; Docket No. 46–3 at p. 76; Docket No. 46–5 at pp. 20 & 22.)

### 2. Findings from Abbott's Expert Witness

Abbott submitted an expert report by Dr. Paul E. Hyman, ("Dr. Hyman"), Professor of Pediatrics at Louisiana State University and Chief of Pediatric Gastroenterology at Children's Hospital of New Orleans. (Docket No. 46–2 at p. 1.) Dr. Hyman is also a fellow in Digestive Diseases at the National Institutes of Health and a fellow in Pediatric Gastroen-

---

**6.** Plaintiff Morales failed to indicate, however, if F.J.G.M. consumed any milk from these containers.

**7.** The FDA also issued press releases regarding the Abbott recall of the Similac powdered milk formula on September 23, and September 27, 2010. (Docket Nos. 8–1, 8–2, 48–3, & 48–4.)

terology at the University of California, Los Angeles. *Id.* He has chaired and co-chaired two working teams that developed the official criteria for diagnosing childhood functional bowel disorder, and has received an award for outstanding achievements from both the American Gastroenterological Association and the International Foundation for Functional Gastrointestinal Disorders. *Id.* at pp. 1–2. In addition, Dr. Hyman has published over 100 peer-reviewed articles, edited three books, and given lectures all over the world. *Id.* at p. 2.

Dr. Hyman's medical opinion is that "the ingestion of Trogoderma variabile beetles, [which are the beetles that were found at the Abbott Sturgis facility,] larvae, or parts has no capability of causing any injury or disorder in human infants." (Docket No. 46–2 at p. 2.) While it is "undesirable" and "disturbing to some" to have insects in infant formula, he stated that "there is no health risk from ingestion of warehouse beetles." *Id.* Additionally, he indicated that his research of medical literature "revealed no reports of warehouse beetle ingestion associated with illness or disease of any sort." *Id.* He did find one case report from the 1960s in an agricultural newsletter—not a medical journal—that suggested there may be a connection between two different types of beetle (but there was no discussion about the warehouse beetle at issue) and two episodes of illness in infants. *Id.* In those two episodes, however, no causal connection was shown. *Id.* at pp. 2–3. Furthermore, since the 1960s article, he has found no studies demonstrating a link between warehouse beetle consumption and illness. *Id.* at p. 3.

Dr. Hyman also specified four reasons why he does not believe that F.J.G.M.'s symptoms were caused by the warehouse beetles that were found in Abbott's Sturgis facility: (1) "there is no physiological pro-cess by which consuming *Trogoderma variabile* beetles could cause gastrointestinal illness;" (2) in addition to gastrointestinal symptoms, F.J.G.M. also had respiratory symptoms, tonsilitis, and ear infections, and none of these symptoms can be caused by insect parts in the digestive system even if one assumes that the insect parts could cause gastrointestinal problems; (3) in November 2010, the infant experienced similar symptoms, months after the recall and after the plaintiffs switched F.J.G.M. to a different formula, which cannot be caused by the *Trogoderma variabile;* and (4) plaintiffs never saw anything "abnormal in F.J.G.M's formula." (Docket No. 46–2 at p. 9.) Dr. Hyman stated that "the possibility that F.J.G.M.'s [September 2010] illness was caused by consumption of warehouse beetles is zero." *Id.* Instead, he stated that a viral respiratory illness was most likely the underlying cause of F.J.G.M's illness. *Id.*

### 3. Observations by Dr. Vargas, F.J.G.M.'s Treating Physician

Aside from the testimony of F.J.G.M.'s parents, plaintiffs only introduce the deposition testimony of Dr. Vargas, F.J.G.M.'s pediatrician. (*See* Docket Nos. 46–3 & 48–9.) Although Dr. Vargas' license is up-to-date and he has to "report 200 credit hours [of training]" every year to receive approval for his license, *id.* at p. 95, he is not board-certified by any medical organization and has no specialization in pediatric gastroenterology, *id.* at p. 10. Aside from the 200 credit hours each year, he has had no additional medical training since he concluded his residency in the early 1970s. *Id.*

Dr. Vargas admitted that he has never read or heard of a child suffering gastroenteritis due to eating insects, including warehouse beetles. (Docket Nos. 46–3 & 48–9 at p. 66.) He also conceded that the acids or enzymes in the stomach would digest or dissolve any insect parts before

they could cause any damage to the gastrointestinal system. (Docket Nos. 46–3 & 48–9 at pp. 67–68). He also indicated that when he treated F.J.G.M., he did not contemplate that F.J.G.M.'s illness was caused by insect consumption. *Id.* at p. 81. He stated that the infant's blood test and white cell counts suggested that his vomiting and diarrhea could have been bacteria-related. (Docket Nos. 46–3 & 48–9 at pp. 60 & 90–94.) Dr. Vargas admitted, however, that he could not completely rule out that F.J.G.M.'s condition was caused by a virus because the infant was taking antibiotics, which can cause "changes" to the blood and "the picture gets fuzzy." *Id.* at 96–97.

Although Dr. Vargas did not believe that F.J.G.M.'s condition was caused by a viral infection, he identified several other possible causes of the infant's gastroenteritis, which include an intolerance to the lactose in the milk; a secondary infection, such as the ear infection that F.J.G.M. had at the time; the infant's ingestion of Amoxil, an antibiotic that can provoke diarrhea; rotavirus, which is a regular virus that attacks the gastrointestinal area; and some other food or beverage that the infant ingested. (Docket Nos. 46–3 & 48–9 at pp. 62–64 & 80.) Furthermore, when questioned about whether it was more likely than not that the recalled Abbott formula caused the infant's hospitalization in September 2010, he answered, "I do not believe so." (Docket Nos. 46–3 & 48–9 at pp. 85–87.) He said that "many things" are feasible and that "[i]t's possible" that the F.J.G.M's illness was somehow related to the recall, "but [he] do[es] not have the elements to say so." *Id.* at p. 87.

## II. STANDARDS

### A. STANDARD UNDER 28 U.S.C. § 636(b)(1)

A district court may refer, *inter alia*, "motions for summary judgment" to a magistrate judge for a report and recommendation. Loc. Rule 72(a)(9); *see* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b). Any party adversely affected by the report and recommendation may file written objections within fourteen days of being served with the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1)(C); Loc. Rule 72(d). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop*, 389 F.Supp.2d 189, 191 (D.P.R.2005) (citing *United States v. Raddatz*, 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). Failure to comply with this rule precludes further review. *See Davet v. Maccarone*, 973 F.2d 22, 30–31 (1st Cir.1992) ("Failure to raise objections to the Report and Recommendation waives the party's right to review in the district court...."). In conducting its review, a court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28, 33–34 (1st Cir.2008). Furthermore, a court may accept those parts of the report and recommendation to which the parties do not object. *See Hernandez–Mejias v. Gen. Elec.*, 428 F.Supp.2d 4, 6 (D.P.R.2005) (citing *LaCedra v. Donald W. Wyatt Det. Facility*, 334 F.Supp.2d 114, 126 (D.R.I. 2004)).

### B. Summary Judgment Standard

The Court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). A fact is "material" if it has the potential to "affect the outcome of

the suit under the governing law." *Id.* A dispute is "genuine" when it "could be resolved in favor of either party." *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir.2004).

The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' " which support its motion. *Id.* (citing Fed.R.Civ.P. 56(c)). Once a properly supported motion has been presented, the burden shifts to the non-moving party "to demonstrate that a trier of fact reasonably could find in [its] favor." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000) (internal citation omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (discussing how the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts").

It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must 'present definite, competent evidence to rebut the motion.' " *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994) (internal citation omitted). Otherwise, summary judgment is appropriate if the non-moving party's case rests merely upon "conclusory allegations, improbable references, and unsupported speculation." *Forestier Frad-*

*era v. Municipality of Mayagüez,* 440 F.3d 17, 21 (1st Cir.2006).

### III. Legal Analysis

■ A federal court sitting in a diversity case must apply the substantive law of the forum where the action is filed. *See Rodriguez v. Señor Frog's de la Isla, Inc.,* 642 F.3d 28, 36 (1st Cir.2011) (internal citations omitted). In their complaint, plaintiffs fail to identify the Puerto Rico Civil Code provisions on which they base their claims. (Docket No. 1.) In Puerto Rico, strict liability and negligence claims are governed by Article 1802 of the Puerto Rico Civil Code ("Article 1802"). P.R. Laws. Ann. Tit. 31 § 5141; *see also Isla Nena Air Servs., Inc. v. Cessna Aircraft Co.,* 449 F.3d 85, 88 (1st Cir.2006) (Even though the Puerto Rico Civil Code does not explicitly incorporate "the doctrine of strict liability, it is well-settled that Puerto Rico courts have adopted that doctrine under Article 1802.") (internal citations omitted). Defendant Abbott claims that it is entitled to summary judgment on both plaintiffs' strict liability and negligence claims. (Docket No. 46.) The Court first addresses defendant Abbott's arguments regarding strict liability and then turns to Abbott's arguments regarding negligence.

### A. Strict Liability

■ With regard to products liability, Puerto Rico has adopted the doctrine of strict liability "under principles flowing from Article 1802." *Isla Nena Air Servs.,* 449 F.3d at 88 (internal citation omitted). Puerto Rico courts rely upon the principles in section 402A of the Restatement (Second) of Torts in adopting the strict liability doctrine. *Id.; see also Cruz–Vargas v. R.J. Reynolds Tobacco Co.,* 348 F.3d 271, 276 (1st Cir.2003); *Perez–Trujillo v. Volvo Car Corp. (Sweden),* 137 F.3d 50, 55 (1st Cir.1998); *Malave–Felix v. Volvo Car*

*Corp.*, 946 F.2d 967 (1st Cir.1991) (citing *Montero Saldaña v. Am. Motors Corp.*, 107 D.P.R. 452 (1978)). Under Puerto Rico law, a plaintiff must prove four elements to prevail in a strict liability action: (1) the product had a manufacturing defect; (2) the defect made the product unsafe[8]; (3) plaintiff used the product in a reasonably foreseeable way; and (4) the defect proximately caused injury to the plaintiff. *Perez–Trujillo*, 137 F.3d at 55 (internal citations and quotation marks omitted).

Defendant Abbott argues that plaintiffs fail to provide any expert testimony regarding the first element, that the product was defective, or the fourth element, proximate causation. (Docket No. 46 at p. 14.) Plaintiffs respond that the evidence on the docket-Abbott's admission regarding the recall and the depositions of plaintiffs and their infant's treating physician-are sufficient to establish that the infant's acute gastroenteritis was caused by contamination of the Similac formula. (Docket No. 48 at p. 7.) The magistrate judge found that plaintiffs failed to establish causation, and, therefore, did not meet their burden to survive summary judgment. (Docket No. 56 at pp. 15–16.) The Court agrees with the magistrate judge because the plaintiffs have failed to demonstrate a genuine dispute about (1) whether a defect existed in the product, and (2) whether a defect in the milk formula caused F.J.G.M.'s injury.

## 1. Defect

Defendant Abbott argues that there is no evidence from which a reasonable jury could find a defect in the milk formula. (Docket No. 46 at p. 18.) Abbott argues that plaintiffs only use the recalls and the FDA notices to support their contention that the milk formula contained a defect. *Id.* This evidence, Abbott contends, is inadmissible under the Federal Rules of Evidence. *Id.* Even if this evidence is admissible, however, Abbott argues that it contains little probative value. *Id.* at pp. 18–19. Finally, Abbott argues that aside from the recall notices, there is no other admissible evidence showing a defect in the milk formula. *Id.* at p. 18. Plaintiffs respond that the notices serve as Abbott's admission that the formula was defective. (Docket No. 48 at p. 11.)

The magistrate judge agreed with Abbott in her R & R regarding Abbott's motion for summary judgment. She found that Abbott's recall notice and the FDA notices regarding the recall are inadmissible under Federal Rules of Evidence 407 and 403. The Court concurs with the magistrate judge; it finds that defendant Abbott has shown that there is no genuine dispute of material fact regarding the element of defect and that plaintiffs have failed to show that a jury could reasonably find for them on this matter.

### a. Federal Rule of Evidence 407

Federal Rule of Evidence 407[9] ("Rule 407") prohibits plaintiffs from introducing

---

**8.** This criteria is "the single significant departure" from the Restatement of Torts, which requires a plaintiff to prove that "the defective product was unreasonably dangerous." *Perez–Trujillo*, 137 F.3d at 55 (internal citations and quotation marks omitted).

**9.** Rule 407 provides, in relevant part:
   "When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made

the injury or harm less likely to occur, *evidence of the subsequent measures is not admissible to prove* negligence, culpable conduct, *a defect in a product,* a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if

evidence that a defendant, after an injury, took steps that would have made the injury or harm less likely to occur. The rule only applies to evidence of a defendant's remedial measures when offered to prove the defendant's fault; this includes, but is not limited to, when the evidence is offered to prove a product defect. *Id.* Rule 407 allows this type of evidence, however, for other purposes, such as to show that a defendant had ownership or control of a product, or that precautionary measures were feasible, if controverted. *Id.* Recall notices and warning decals that are issued after an accident or injury are considered to be subsequent remedial measures under Rule 407. *See Carballo–Rodriguez v. Clark Equipment, Co., Inc.,* 147 F.Supp.2d 66, 77 (D.P.R.2001); *see also Cameron v. Otto Bock Orthopedic Indus., Inc.,* 43 F.3d 14, 17 (1st Cir.1994); *Raymond v. Raymond Corp.,* 938 F.2d 1518, 1523 (1st Cir. 1991); *Benitez–Allende v. Alcan Aluminio do Brasil, S.A.,* 857 F.2d 26 (1st Cir.1988).

Abbott's recall notice occurred on September 22, 2010, announcing "a proactive, voluntary recall of certain Similac-brand, powder infant formulas." (Docket No. 48–6.) In addition, Abbott stated that "[t]he FDA has determined that while the formula containing [the] beetles poses no immediate health risk, there is a possibility that infants who consume formula containing the beetles or their larvae, could experience symptoms of gastrointestinal discomfort and refusal to eat as a result of small insect parts irritating the GI tract." *Id.* The FDA notices, which were issued on September 23, September 27, and October 26, 2010, respectively, also state that while there are "no long-term health problems, there is a possibility that infants who consume formula containing the beetles or their larvae could experience gastrointestinal discomfort and refusal to eat as a result of small insect parts irritating the GI tract." (Docket Nos. 48–2, 48–3, & 48–5.)

■ These statements, the plaintiffs argue, are sufficient to show that a defect occurred. The recall notices that plaintiffs seek to use as evidence of a defect fall within the purview of Rule 407: they were issued after the accident or injury, and they indicated that consumers should return the product to Abbott. Therefore, the notices are inadmissible to show that the Similac formula contained warehouse beetles. Plaintiffs fail to argue that the notices are admissible for other purposes permitted by Rule 407. Nor do plaintiffs argue that defendant Abbott has controverted any of the Rule 407 admissible purposes. That result serves the "twofold purpose of Rule 407" as stated in the Advisory Committee Notes. *Raymond,* 938 F.2d at 1523. First, it prevents unfair prejudice to a defendant because "jurors would too readily equate subsequent design modifications with admissions of a prior defective design." *Id.* Second, it "further[s] the social policy of encouraging manufacturers to create safer products" by "continuing to update and improve upon the safety features of their products after initial manufacture." *Id.*

### b. Federal Rule of Evidence 403

■ Even if the notices are admissible and are relevant,[10] they must comport with the requirement of Federal Rule of Evi-

---

controverted, or impeachment." Fed. R.Evid. 407 (emphasis added).

**10.** Evidence is relevant when "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining

the action." Fed.R.Evid. 401. The recall notices from Abbott and the FDA are relevant because they have a tendency to make more probable the existence of a defect in the Similac formula that F.J.G.M. consumed.

dence 403 ("Rule 403") that their probative value outweigh the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See also United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir.2000). The First Circuit Court of Appeals has held that Rule 403 protects "against *unfair* prejudice, not against all prejudice" (emphasis added). *United States v. Whitney*, 524 F.3d 134, 141 (1st Cir.2008); *see also United States v. Amaya–Manzanares*, 377 F.3d 39, 45 (1st Cir.2004) (discussing how all relevant evidence that the government introduces is prejudicial in some way to a defendant). "'Unfair prejudice'" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403, Advisory Committee Notes. Pursuant to Rule 403, a trial court has "considerable latitude in determining whether to admit or exclude evidence." *Santos v. Sunrise Medical*, 351 F.3d 587, 592 (1st Cir.2003) (internal citations omitted). When a trial court finds the balancing close, "Rule 403 tilts the balance in favor of admission." *Whitney*, 524 F.3d at 141 (internal citations omitted).

■ Defendant Abbott contends that the recall notices are "not remotely probative of defectiveness." (Docket No. 46 at pp. 18–19.) Plaintiff makes no arguments in response to this contention. They merely state, in a cursory manner, that Abbott admits in its notices that the formula was contaminated and thus, defective. (Docket No. 48 at p. 11.) The Court agrees with defendant Abbott.

First, the First Circuit Court of Appeals has stated that "[a]t best, subsequent remedial measures are considered marginally probative of prior negligence." *Keller v. United States*, 38 F.3d 16, 32 (1st Cir.1994) (internal citation omitted). Second, defen-

dant Abbott has provided other evidence to suggest that the probative value of the recall notices is low. Matthew Painter, the Senior Program Manager for Third Party Manufacturing in the Abbott Nutrition Supply Chain of Abbott Laboratories, provided an uncontested declaration that after Abbott discovered beetles in its machinery, it tested an additional 30,486 containers from over twenty batches of Similac powder manufactured in the Sturgis plant. In total, only forty-nine beetles, larvae, or parts were found in these containers, which means that only 0.16% of the sample was found to be contaminated. Plaintiffs also stated that they never saw any insects in the formula that they fed to F.J.G.M. Furthermore, defendant's expert witness, Dr. Hyman, indicated that he thoroughly reviewed the two sources that the FDA relied upon in issuing its statement that the warehouse beetles "could" cause minor illness, and he concluded that the FDA was not realistically assessing the actual medical risk of ingesting the beetles; rather, his research indicates that the FDA was acting with the "utmost of caution." (Docket No. 46–2 at p. 4.)

■ The danger of unfair prejudice is high in this case because of the possibility that the recall notices would confuse or mislead the jury. A recall notice by a manufacturer "does not admit a defect in a particular product, but refers to the possibility of a defect in a class of products." *See e.g., Bailey v. Monaco Coach Corp.*, 350 F.Supp.2d 1036, 1045 (N.D.Ga.2004) (internal citation omitted). As the Court indicated earlier, however, jurors would too readily equate a recall notice with an admission that the product was defective, and make the leap that because warehouse beetles were found in the facility that produced the milk formula, then the particular can of formula ingested by F.J.G.M. also contained warehouse beetles. *Raymond*,

938 F.2d at 1523; *see also Carballo–Rodriguez*, 147 F.Supp.2d at 77 (citing *Bogosian v. Mercedes–Benz of N. Am., Inc.*, 104 F.3d 472, 481 (1st Cir.1997)).

Because the high danger of unfair prejudice outweighs the marginal probative value of the recall notices issued by defendant Abbott and the FDA, the Court **ADOPTS IN FULL** the magistrate judge's findings on the element of a product defect.

### 2. Causation

Even if the plaintiffs established that a jury could reasonably find for them with regard to whether there was a defect in the milk formula, they have failed to demonstrate that a jury could reasonably find that the milk formula caused F.J.G.M.'s injuries. As the magistrate judge found, plaintiffs have failed to introduce any expert testimony or any circumstantial evidence to support their claims that the milk formula caused the infant's illness.[11] The Court **ADOPTS IN FULL** the magistrate judge's findings on the element of causation.

■ In Puerto Rico, strict liability claims "need not adduce expert testimony to overcome a motion for summary judgment." *Perez–Trujillo*, 137 F.3d at 55. "Strict liability claimants may resort to an array of circumstantial evidence," including direct observations regarding the malfunction of a product, or other circumstantial evidence, such as similar accidents involving the same product, elimination of other possible causes of the accident, and proof tending to establish that the accident does not occur absent a manufactur-

ing defect. *Id.* at n. 10. The necessity of expert opinion evidence, however, is whether the question is one of common knowledge such that lay people could "reach the conclusion as intelligently as the witness." *Collazo–Santiago v. Toyota Motor Corp.*, 937 F.Supp. 134, 140 (D.P.R. 1996) (internal citation and quotation marks omitted). If the question cannot be answered by common experience, then expert testimony is required. *Id.* For example, in *Collazo–Santiago*, the plaintiff established that a car airbag caused her injury because she "will personally testify that she felt the airbag hit her face and abrade it." *Id.* In this case, the facts are scientifically driven and plaintiffs cannot show that the milk formula caused F.J.G.M.'s injury simply via common experience. *Cf. Martinez–Serrano v. Quality Health Servs. of Puerto Rico, Inc.*, 568 F.3d 278, 286 (1st Cir.2009) (discussing how plaintiffs generally have to provide expert testimony in medical malpractice cases because "they tend to be scientifically driven and more nuanced than most tort cases" but in a "narrow band" of tort cases, some plaintiffs may not have to produce expert testimony).

■ In her R & R regarding defendant Abbott's motion to dismiss, the magistrate judge warned that plaintiffs must provide "expert medical testimony" because the issue of medical causation is not something "within common knowledge of the layman." (Docket No. 23 at pp. 9–10.) The fact that the infant was sick after consuming the Similac formula is insufficient to show that the formula caused the infant's illness. *See, e.g., Carmona v. S. Am. Rests. Corp.*, No. 07–1314(SEC), 2009 WL 928722, at *5 (D.P.R. March 31, 2009)

---

**11.** Plaintiffs also argue that the recall notices issued by Abbott and the FDA are sufficient to prove causation. Because the Court found that these notices are inadmissible under Rule 407 and Rule 403 as to the element of product defect, they are inadmissible under these rules as to the element of causation as well.

(granting summary judgment in a negligence action when "nothing in the record points to [d]efendants' product as the cause of [plaintiff's illness]" even though plaintiff was clearly ill after consuming food at the restaurant). Yet, plaintiffs have failed to provide any expert testimony regarding causation. Abbott argues that plaintiffs have not tendered any expert during discovery in compliance with Federal Rule of Civil Procedure 26. (Docket No. 46 at p. 17.) Plaintiffs do not respond to this argument in their opposition to Abbott's motion for summary judgment. (Docket No. 48.) Indeed, their only testimony aside from that of F.J.G.M.'s parents comes from Dr. Vargas, the infant's treating physician. (Docket No. 48–9.)

■ Even if no expert testimony is required in this case, plaintiffs fail to provide any circumstantial evidence to establish that the Similac formula caused F.J.G.M.'s illness. In fact, both the testimony of the plaintiffs and Dr. Vargas show circumstantial evidence establishing that F.J.G.M.'s sickness was not caused by the Similac formula.

First, the plaintiffs testified that they did not see any insect parts in the formula and have presented no other evidence that anyone else who consumed the Similac formula has experienced similar problems. Second, on November 30, 2010, about two months after the plaintiffs stopped giving F.J.G.M. the Similac formula, F.J.G.M. was admitted to the hospital again with symptoms similar to his September 2010 illness, including acute gastroenteritis, moderate dehydration, otitis, and tonsilitis. This suggests that F.J.G.M.'s illness was not caused by the formula, as contended by plaintiffs; rather, the infant's medical history suggests that these symptoms are recurring problems for F.J.G.M.

Finally, Dr. Vargas' testimony eliminates contamination of the Similac formula as the cause of F.J.G.M.'s illness and suggests that there are other more likely causes of the sickness. For example, he testified that not only has he never read or heard of a child suffering gastroenteritis due to eating insects, including warehouse beetles, but that he also stopped F.J.G.M's ingestion of Amoxil because it can cause diarrhea. He also listed a number of other reasons that could have caused F.J.G.M.'s gastroenteritis, including lactose intolerance and the possibility that the infant's ear infection caused a secondary infection in the stomach and intestines. Furthermore, Abbott's expert report confirms Dr. Vargas' observations that F.J.G.M. may have had a secondary infection from his illness: Dr. Hyman stated that there is "zero" chance that F.J.G.M.'s September 2010 illness was caused by the ingestion of warehouse beetles and instead indicated that the illness was probably due to an underlying infection.

Plaintiffs have failed to establish that a jury could reasonably find for them as to whether Abbott's allegedly defective milk formula caused the F.J.G.M.'s injury. Instead, the defendant has provided sufficient evidence to show that there is no genuine dispute on the issue of causation. Therefore, the Court **ADOPTS IN FULL** the magistrate judge's findings on the element of causation.

Defendant Abbott has shown that there is no genuine issue of material fact regarding the elements of defect and causation in a strict liability action, and plaintiffs have failed to show that a jury could reasonably find in their favor. For these reasons, the Court **GRANTS** defendant Abbott's motion for summary judgment regarding plaintiffs' products liability claim.

## B. Negligence Under Article 1802

In Puerto Rico, Article 1802 of the Civil Code [12] provides for a cause of action resulting from an individual's negligent act. *Isla Nena Air Servs.*, 449 F.3d at 88 (1st Cir.2006). Under Article 1802, plaintiffs must prove three elements of negligence: (1) an injury, (2) a breach of duty, and (3) proximate causation. *Vazquez–Filippetti v. Banco Popular de P.R.*, 504 F.3d 43, 49 (1st Cir.2007) (internal citations omitted). The second element requires plaintiffs to show the existence of a duty and its breach. *Id.* (quoting *Rodriguez–Ortega v. Philip Morris, Inc.*, Civil No. 03–1529(CCC), 2005 WL 2977795, at *5–6 (D.P.R. Nov. 7, 2005) ("Plaintiffs bear the burden of establishing the applicable standard of care and proving that [defendant] acted below that standard.") (internal citations and quotations omitted). Abbott correctly argues that plaintiffs have failed to establish the applicable standard of care and that Abbott acted below that standard. (Docket No. 46 at p. 21.) Abbott has provided evidence to show that it performed extensive quality testing on the Similac powdered milk formula at the Sturgis facility. Furthermore, Abbott provided specific evidence that it employs a third-party pest-control company to service its Sturgis plant and that a July–August 2010 internal compliance audit and a March 2010 audit by the FDA found no significant issues with the facility. There is no evidence from plaintiffs in the record establishing that these actions by Abbott breached any applicable standard of care. Thus, there is no evidence in the record from which a jury could conclude that Abbott breached any duty owed to plaintiffs. Plaintiffs fail to make any argument regarding this portion of Abbott's motion even though they acknowledge that they must show the duty owed by defendant and that defendant breached that duty. (Docket No. 48 at p. 11.) Therefore, defendant Abbott is entitled to summary judgment on plaintiffs' Article 1802 negligence claim.

For these reasons, the Court **ADOPTS IN FULL** the magistrate judge's findings on plaintiffs' negligence claim and **GRANTS** defendant Abbott's motion for summary judgment regarding plaintiffs' negligence claim.

## IV. CONCLUSION

Accordingly, the Court **GRANTS** defendant Abbott's motion for summary judgment. This case is therefore **DISMISSED with prejudice.**

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

CAMILLE L. VELEZ–RIVE, United States Magistrate Judge.

### INTRODUCTION

Plaintiffs Kizzy Morales–Velázquez and Fernando Guzmán–Merly, on their own and as parents of minor F.J.G.M. (hereafter "plaintiffs") filed a complaint against defendant Abbot Laboratories, Inc. (hereafter "Abbot") based on product liability and negligence claims for a recalled infant formula manufactured by Abbot which they consider caused acute gastroenteritis to the infant which resulted in a five-days hospitalization. (Docket No. 1).

Abbot has filed a Motion for Summary Judgment, with its memorandum in sup-

---

**12.** The statute states, in relevant part, that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. Tit. 31, § 5141.

port and statement of uncontested facts, submitting plaintiffs have no written discovery, no depositions and no expert report or witness. Plaintiffs only witness is the infant's treating physician Dr. Juan Vargas–Raposo (hereafter "Dr. Vargas–Raposo") who testified not knowing what caused the gastroenteritis. Thus, plaintiffs have no evidence to establish causation. (Docket Nos. 44, 45 and 46).

Plaintiffs filed their opposition to Abbot's summary judgment for they learned after the infant was discharged from the hospital that the baby formula they fed him was object of a recall issued by Abbot for the product, Lot No. 58830T26, for being contaminated with insect pieces, larvae and/or adult insects. Plaintiffs concluded from the FDA press releases of September 27, 2010 and October 26, 2010, the milk formula was indeed contaminated. Plaintiffs admit their evidence consists of the recall campaign, plaintiffs' depositions and the deposition of the infant's treating physician, Dr. Vargas–Raposo. Plaintiffs consider this evidence as sufficient to defeat summary judgment for being plausible, within a preponderance of the evidence, the infant's gastroenteritis was caused by contamination of the baby powder milk formula at issue.(Docket No. 48).

Defendant Abbot submitted a reply memorandum of law in further support of its Motion for Summary Judgment. (Docket No. 51). Therein, Abbot reinstates plaintiffs' contention of having no need to present expert testimony. Thus, plaintiffs have conceded to defendant's argument as to their lack of evidence of causation, which standing alone, would require summary judgment. Abbot also states plaintiffs' claimed rebuttal evidence to defeat summary judgment is either inadmissible and/or non-probative. Abbot opposes plaintiffs' attempt to admit the voluntary recall notices as purported evidence of a defect in the product. Said voluntary recall should not be admitted for it is a subsequent remedial measure and, if admitted, its probative value is greatly outweighed by its potential for prejudice. Furthermore, a recall notice is insufficient to create a triable issue regarding the existence of a defect upon lack of sufficient scientific foundation as per Abbot's expert testimony.

Plaintiffs then filed a sur-reply contesting defendant's reply and prompting the Court, within its discretion, to admit the voluntary recall and FDA notices, for such notices are able to present a reasonable inference for a jury that bug infestation was the probable cause of the infant's gastroenteritis, although admittedly said medical condition is not exclusively caused by defendant's contaminated milk. (Docket No. 55).

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." *Vega–Rodríguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." *Cortés–Irizarry v. Corporación Insular,* 111 F.3d 184, 187 (1st Cir.1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. *Id.* More-

over, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Id.*

At all times during consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." *Maldonado–Denis v. Castillo–Rodríguez,* 23 F.3d 576, 581 (1st Cir.1994). There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood.…" *Greenburg v. Puerto Rico Mar. Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987). In fact, "[o]nly if the record, viewed in [this] manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997).

## UNCONTESTED ISSUES OF FACTS

### I. ABBOT'S UNCONTESTED ISSUES OF FACT.

#### A. Infant F.J.G.M.'s Conditions and Symptoms.

The infant identified as F.J.G.M. was born on July 2009 and has suffered from health problems since birth. During his first year, his pediatrician Dr. Vargas–Raposo recommended a milk formula, not at issue herein, since the infant suffered from vomiting and reflux. By July 1, 2010, when F.J.G.M. was one year old, Dr. Vargas–Raposo recommended the Similac Go & Grow formula manufactured by Abbot ["Similac"] and by September 2010 some unspecified baby food was added to the infant's diet. (Docket No. 46, Exhibit 1, plaintiff Morales' depo., pp. 16–17, 32; Exhibit 2, Report of Dr. Paul E. Hyman, Abbot's expert; Exhibit 3, Dr. Vargas–Raposo's depo., p. 39).

About a month after F.J.G.M. began consuming Similac, by July 29, 2010, he was taken to Ryder Memorial Hospital with nasal discharge and a fever, showing inflammation of throat and tonsils and was prescribed several medicines, including antibiotic. (Docket No. 46, Exhibit 3, p. 46; Exhibit 2, Dr. Hyman's report; Exhibit 4, counsel Mariana Negrón's statement, Attachment A).[1]

On August 10, 2010, F.J.G.M. visited the emergency room and was diagnosed with another upper respiratory infection. An X-ray the next day showed a viral respiratory infection and gastric distention from excessive swallowing of air. (Docket No. 46, Exhibit 3, Dr. Vargas–Raposo's depo., pp. 46–47; Exhibit 2, Dr. Hyman's report; Exhibit 4, Ryder's Hospital record, Attachment A).

On August 31, 2010, F.J.G.M. visited again the Ryder Hospital complaining of cough and was diagnosed with upper respiratory infection.

On September 10, 2010, F.J.G.M.'s parent took him to the hospital and he presented another upper respiratory infection and right otitis media. At this point, F.J.G.M.'s parents testified he also suffered from diarrhea but the admission's record stated "no" box checked for "nausea, vomiting, diarrhea." At the time, the infant was taking Amoxil, an oral antibiotic

---

1. Attachment A is the medical record of Ryder's Hospital organized by Atty. Mariana Negrón in chronological order as made available by plaintiffs. Attachment B is neonatologist Noel Vargas Rodríguez' medical record of infant F.J.G.M.

capable of causing diarrhea which had been prescribed by Dr. Vargas–Raposo for respiratory and tonsil infections. (*Id.*).

On September 21, 2010, another X-ray noted lung irregularities suggestive of viral infection. F.J.G.M. was prescribed antibiotics, presumably Amoxil. On September 22, 2010, the date of the Similac recall, F.J.G.M. visited Dr. Vargas–Raposo suffering from diarrhea. Antibiotic was suspended because of the fact Amoxil antibiotics gives diarrhea. (Docket No. 46, Exhibit 3, Dr. Vargas–Raposo's depo., pp. 54–56; Exhibit 2). Dr. Vargas–Raposo referred F.J.G.M. to the hospital. Upon admission, the infant was experiencing acute gastroenteritis with secondary diagnosis of otitis and moderate dehydration. F.J.G.M. was discharged from the hospital on September 25, 2010. (Docket No. 46, Exhibit 3, pp. 59, 61; Exhibit 2). According to F.J.G.M.'s mother, the diarrhea gradually improved and was gone within three (3) days from discharge. (Docket No. 46, Exhibit 1, Morales' depo., p. 51; Exhibit 2).

Over two (2) months after, his parents switched F.J.G.M.'s milk from Similac to a Gerber-brand formula, on November 27, 2010, the infant went to the emergency room with ear and throat infection. On November 30, 2010, F.J.G.M. was admitted to the hospital for five (5) days and presented very similar symptoms to his September 2010th hospitalization: gastroenteritis, dehydration, ear infection and tonsilitis. (Docket No. 46, Exhibit 3, Dr. Vargas–Raposo's depo., pp. 73, 75, 76–77; Exhibit 2; Exhibit 4, Attachment A). Another X-ray showed lung irregularities typical of a viral infection. (Docket No. 46, Exhibit 3, p. 76; Exhibit 2; Exhibit 4, Attachment A). Ms. Morales testified that in her opinion, this time F.J.G.M.'s diarrhea was caused by the antibiotics. (Docket No. 46, Exhibit 1, p. 56).

### B. Abbot's Similac Product at Sturgis.

On September 25, 2010, Abbot detected warehouse beetles while performing quality testing on an unreleased batch of Similac at its Sturgis, Michigan facility. (Docket No. 46, Exhibit 6, Mathew Painter's statement ¶ 6). The finding was reported to Abbot's headquarters and all powder production and shipment at Sturgis were stopped. (*Id.*, ¶ 15). Abbot had not previously detected warehouse beetles in its Similac product despite extensive quality testings. (*Id.*, ¶¶ 11–14). After the beetles were detected, Abbot tested many additional units of product to evaluate the extent of the potential contamination; some 30, 486 containers from 22 separate lots of powder Similac.[2] A total of 49 beetles, larvae and/or parts—a rate of 0.16%—were detected. (*Id.*, ¶¶ 13–17). Regardless of the tests of virtually beetle free containers of Similac, on September 22, 2010, Abbot issued a voluntary recall of Similac brand powder products manufactured in the relevant area of Sturgis facility. Although Abbot's testing did not detect any beetles in its products before September 15, 2010, Abbot elected to recall all products manufactured in the relevant area of the plant since September 2007. Abbot made this choice because the shelf life of powder Similac is up to three (3) years and as a precaution it chose to recall all products still within their shelf life. (Docket No. 46, Exhibit 6, ¶¶ 6–10).

Abbot performed extensive quality testing on all powdered Similac manufactured

**2.** The liquified Similac tested was filter and strained with a 200–micron (0.008 inch) pores.

at Sturgis before releasing products to the public. Abbot employed a prominent pest-control company to service Sturgis at a regular basis and followed all said company's recommendations. Both internal compliance audit in July–August 2010 and an inspection by the U.S. Food and Drug Administration (hereafter "FDA") in March 2010 found no significant issues with the Sturgis plant. (*Id.*, ¶¶ 11–15, 18–20, 21–22).

## C. Similac's Product in relation to F.J.G.M.

Plaintiffs' learned about Abbot's recall from a television news show sometime during F.J.G.M.'s hospitalization of September 2010. Plaintiff Morales went to Abbot's website to check whether the can of Similac she was feeding to F.J.G.M. was part of the recall and discovered it was. Ms. Morales had about six (6) containers of Similac at her house but did not testify if these were part of the recall or if F.J.G.M. had ever consumed any of its content. While F.J.G.M. was still hospitalized, Ms. Morales' father returned all the cans of Similac to the supermarket at her behalf and the supermarket gave Ms. Morales six (6) free cans of another brand of formula in exchange. Ms. Morales called Abbot and was offered a refund check in the amount of $54.95. (Docket No. 46, Exhibit 1, Ms. Morales' depo., pp. 41–42, 45, 46, 49).

On October 26, 2010, the FDA issued an official press release announcing Abbot had worked with state and FDA officials to correct the situation and prevent its recurrence. (Docket No. 8, Exhibit C, Motion to Dismiss).

Plaintiffs never saw insects in any Similac formula they fed to F.J.G.M. After learning of the recall, plaintiffs did not examine the Similac in their possession before returning it to the supermarket. (Docket No. 46; Exhibit 1, Ms. Morales' depo., p. 50; Exhibit 5, plaintiff Guzmán's depo., p. 21).

## D. Abbot's Expert Witness.

Abbot submitted an expert report by Dr. Paul E. Hyman (hereafter "Dr. Hayman"), Professor of Pediatrics at Louisiana State University and Chief of Pediatric Gastroenterology at Children's Hospital of New Orleans. Dr. Hyman has chaired and/or co-chaired two (2) working teams that developed the official criteria for diagnosing childhood functional bowel disorder. He has received awards for outstanding achievements from the American Gastroenterological Association and the International Foundation for Functional Gastrointestinal Disorders. Dr. Hyman has published over 100 peer-reviewed scientific articles, edited three books and given lectures all over the world. (Docket No. 46, Exhibit 2, Dr. Hyman's report, ¶¶ 1–2).

On general causation, Dr. Hyman stated that "the ingestion of *Trogoderma variable* beetle, larvae or parts has no capability of causing any injury or disorder in human infants" [the beetle identified in a very limited sample at Sturgis facility]; and that "there is no health risk from ingestion of warehouse beetles." (Docket No. 46, Exhibit 2). Dr. Hyman also indicated in his report that: a "careful search of the medical literature revealed no reports of warehouse beetle ingestion associated with illness or disease of any sort; [w]arehouse beetles ... have not been shown to carry any harmful bacteria capable of causing illness; [w]arehouse beetles ... are harmless to ingest; there is no physiological process by which consuming *Trogoderma variable* beetles could cause gastrointestinal illness." (Docket No. 46, Exhibit 2, Dr. Hyman's report ¶¶ 2, 4, 9).

On specific causation Dr. Hyman concluded that: "viral respiratory infection is the most likely underlying cause for

F.J.G.M.'s alleged illness between September 20–25, 2010; [t]here is no medical evidence ... that F.J.G.M. consumed warehouse beetles; the possibility that F.J.G.M.'s illness was caused by warehouse beetles is zero". (Docket No. 46, Exhibit 2, ¶ 9).

### E. Infant's Treating Physician.

Dr. Vargas–Raposo, F.J.G.M.'s pediatrician and fact witness announced by plaintiffs, is not board-certified by any medical organization, has no specialization in pediatric gastroenterology and no additional medical training since he concluded his residency in the early 1970's. (Docket No. 46, Exhibit 3, Dr. Vargas–Raposo's depo., p. 10). Dr. Vargas–Raposo has never read or heard of a child suffering gastroenteritis due to eating insects, including warehouse beetles. (*Id.*, p. 66). As to F.J.G.M., Dr. Vargas–Raposo testified he did not contemplate the infant's illness was caused by Abbot formula or by insect consumption. He listed a number of other things which, in his medical opinion, might conceivable have caused F.J.G.M.'s gastroenteritis, to wit, because of [lactose] in the milk; secondary infection the child had, ear infection; the previous taking of Amoxil, an antibiotic that can provoke diarrhea; by some other food or beverage the child consumed. (Docket No. 46, Exhibit 3, Dr. Vargas–Raposo's depo., pp. 63, 80). Finally, when Dr. Vargas–Raposo was asked whether "it's more likely than not that the child's hospitalization in September 2010 was caused by the situation of the recall of the Abbot[t] formula," he answered "I do not believe so." (*Id.*, p. 85).

## II. PLAINTIFFS' UNCONTESTED ISSUES OF FACT.

Plaintiffs submitted as uncontested issues, based on the September 23, 2010 FDA Press Release and the September 22, 2010 Recall Notice of the Similac product, that Abbot has failed to show it took all adequate procedures to avoid contamination of the Similac baby powder formula. Plaintiffs propose these notices stated that "[t]here is a possibility that the infants who consume formula containing the beetles or their larvae could experience gastrointestinal discomfort and refusal to eat as a result of small insect parts irritating the GI tract". (Docket No. 48–1, Opposing Statement, ¶¶ 5, 6).

As to the treating physician Dr. Vargas–Raposo, plaintiffs refer the record of the hospital treatment was incomplete for which reason Dr. Vargas–Raposo could not testify at the deposition what treatment was ordered. Dr. Vargas–Raposo testified the infant admitted to the hospital on September 22, 2010 did not have pneumonia; he had diarrhea and vomiting, being diagnosed with acute gastroenteritis. Plaintiffs refute defendants in that Dr. Vargas–Raposo did not have elements to state the gastroenteritis was caused by antibiotics, lactose intolerance or otitis. He testified the infant's blood test and white cell counts suggested vomiting and diarrhea could have been bacteria related. (Docket No. 48–9, Dr. Vargas–Raposo's depo., pp. 60–62, 87, 94). Dr. Vargas–Raposo has taken some 200 credit hours of continuing education to keep his medical license up to date that includes medical training. (*Id.*, p. 95). Dr. Vargas–Raposo also testified he could not rule F.J.G.M.'s symptoms were 100% viral since he was receiving antibiotics for which the blood changes and the picture gets fuzzy. (*Id.*, pp. 96–97).

Plaintiff Morales testified she watched the television news related to the Similac powder milk formula recall which indicated that it was contaminated. (Docket No. 48, Exhibit 8, Ms. Morales' depo., p. 42). Plaintiffs' reports identified as Exhibits A–

F [Exhibits 2–6 at Docket No. 48], refer to the FDA recall notices and Abbot's recall notice.

Plaintiffs' submit their infant child was a healthy boy. (Docket No. 48, ¶ 14) (Mr. Guzmán's depo., p. 23 [referring to Docket No. 46–7, defendant Abbot's Memorandum in Support of Summary Judgment] ).[3]

Plaintiffs' opposition also submits that the statement of Mr. Mathew Painter, Senior Program Manager for Third Party Manufacturing in the Abbot Nutrition Supply Chain of Abbot Laboratories, indicated a presumption that the larvae had been detected in Similac powder milk formula. This conclusion is derived by plaintiffs from Painter's statement that in the rare instances that samples tested out for this kind of bacteria, the batches were promptly destroyed. (Docket No. 48, Painter's statement ¶ 11). Painter had also declared that 49 beetles, larvae or parts were detected in the filter sock around September 15, 2010. (*Id.*, ¶¶ 15, 16).

On the above issues of facts, plaintiffs argue defendant Abbot's summary judgment should be denied notwithstanding having no written discovery, no additional depositions and no medical expert's testimony except for the treating physician of the infant. Plaintiffs aver that the three (3) depositions, namely, from the two (2) plaintiffs parents of the infant and the treating physician, together with the recall notices should be sufficient to meet the preponderance criteria that acute gastritis suffered by the infant was caused by contamination of the Similac baby powder milk formula.

## LEGAL ANALYSIS

In the present case, defendant Abbot's summary judgment is mainly supported by plaintiffs' lack of any expert testimony or medical evidence to support causation of F.J.G.M.'s acute gastroenteritis and resulting hospitalization of September 20, 2010 was due to ingesting contaminated milk.

When an alleged defect in a product need not be the only cause of harm to a plaintiff, it may be considered a close call whether plaintiffs' causation evidence is sufficient to survive summary judgment and liability may be found where the defect is a "substantial factor" in bringing about the harm. *See* Restatement (Second) of Torts § 431 (1965); *see Sheehan v. The North American Marketing Corp.*, 610 F.3d 144 (1st Cir.2010).

### I. Plaintiffs' Lack of Expert Witness.

In regards with plaintiffs' lack of expert witness testimony, those jurisdictions which model their decisional law along Restatement lines *uniformly* hold that a strict liability claimant may demonstrate an unsafe defect through direct eyewitness observation of a product malfunction, and need not adduce expert testimony to overcome a motion for summary judgment. Although it is helpful for a plaintiff to have direct evidence of the defective condition which caused the injury or expert testimony to point to that specific defect, such evidence is not essential in a strict liability case based on § 402A (of the Restatement (Second) of Torts), and direct observation of the malfunction itself is circumstantial evidence of a defective condition. *See Pérez–Trujillo v. Volvo Car Corp. (Sweden)*, 137 F.3d 50 (1st Cir.1998); *Collazo–Santi-*

---

**3.** Mr. Guzmán's deposition referred by plaintiffs in their opposition and statement of uncontested facts could not be located as part of plaintiffs' filings in their opposition to summary judgment, neither at Docket Nos. 48 nor

Docket No. 55. However, it is part of the record before this Court in defendant Abbot's attachment and is also referred by Abbot in its reply, for which consideration of said document is proper.

*ago v. Toyota Motor Corp.,* 937 F.Supp. 134 (D.Puerto Rico, 1996).

However, in the present case, plaintiffs have no direct observation as to any insects in the milk formula. Neither is the case a situation where the only possible cause of the infant's medical condition may have been caused because of the milk formula not even one where the preponderance of the evidence reasonably leads towards the infant's condition on September 2010 being caused by ingestion of the powder milk. To the contrary, the treating pediatrician did not even consider at the time the milk could have been the cause, but first addressed the antibiotic medication and the otitis infection. Moreover, defendant's medical expert witness testified as to the formula not being the cause of the gastroenteritis. As such, plaintiffs lack evidence of causation. If evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Price v. General Motors Corp.,* 931 F.2d 162, 165 (1st Cir.1991) (citing to *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–2511, 91 L.Ed.2d 202 (1986)).

Still, it may be argued that an issue of fact in controversy exists because Mr. Guzmán, the infant's father, testified the child was healthy. This fact is rebutted by the medical records. The contradicting medical record of treatments since birth shows the infant has suffered from previous various conditions and even a subsequent one to the date at issue in the Complaint for in the month of November 2010, after defendant Abbot's milk product had been discontinued, the infant was undergoing similar symptoms to the ones claimed to have been caused by the alleged contaminated milk on the previous month. However, we deem this credibility determination to be non-relevant for summary judgment purposes because, even if we were to consider for the sake of the argument that the infant was healthy at all times since birth, plaintiffs' lack of causation as to the defendant milk formula in the time-frame alleged in the complaint still remains non-existent.

Causation is a required element in every product liability case. As the Supreme Court of Puerto Rico has noted, a strict liability cause of action requires proof of both product defect and causation, and a manufacturer's failure to warn is a type of product defect. *Rivera Santana v. Superior Pkg., Inc.,* 132 D.P.R. 115, 126–28 (1992). Plaintiffs refer that, under the doctrine of strict liability, a manufacturer and retailers are liable for damages if the product left their hands in a defective condition proximately causing the mishap. Still, plaintiff must establish the product was defective, the defect arose while in the control of defendant and plaintiff suffered injury thereby. This burden has not been met by plaintiffs in this case.

## II. Abbott's Recall and FDA Notices—Federal Rules of Evidence 403 and 407.

In addition, plaintiffs in their sur-reply argue towards the admission of the recall and FDA notices under the Court's discretionary authority regardless that these constitute a subsequent remedial measure, for such evidence is deemed to be a party admission. (Docket No. 55). Plaintiffs' evidence has established the milk formula consumed by the infant in this case was from the lot object of recall for which there is a possibility that it had been contaminated. Plaintiffs also aver the evidence also establishes the infant F.J.M.G. was hospitalized suffering from a medical diagnosis of acute gastroenteritis, and although this condition is not exclusively caused by contaminated milk, a reasonable jury may infer and thus find the medical

condition was caused by the infant having consumed the product. Plaintiffs conclude Dr. Vargas–Raposo acknowledged being possible that the gastroenteritis was caused by the contaminated milk. (Docket No. 48, Dr. Vargas–Raposo's depo., pp. 86–87).

Abbot's response indicates plaintiffs fail to argue the need of expert testimony, thus conceding to defendant's position and making the matter waived and in defendant's favor. Insofar as the rebuttal evidence presented in plaintiffs' opposition, defendant avers the same is either inadmissible or non-probative. *See Smith v. Robertshaw Controls Co.,* 410 F.3d 29 (1st Cir.2005), the Court of Appeals affirmed the district court having granted summary judgment in the absence, among others, of an expert testimony or evidence that the product was subject to recall.[4]

Abbot's recall notice[5] of September 22, 2010 (Docket No. 48–6, Exhibit E) refers to "a proactive, voluntary recall of certain Similac-brand, powder infant formulas in the U.S., Puerto Rico, Guam and some countries in the Caribbean. Abbot is recalling these products following an internal quality review, which detected the remote possibility of the presence of a small common beetle in the product produced in one production area in a single manufacturing facility. The FDA has determined that while the formula containing these beetles pose no immediate health risk, there is a possibility that infants who consume formula containing the beetles or their larvae, could experience symptoms of gastrointes-

tinal discomfort and refusal to eat as a result of small insect parts irritating the GI tract. If these symptoms persist for more than a few days, a physician should be consulted."

The general Abbot's recall notice above only refers to a remote possibility of contamination, not as an admission of a party that it was indeed contaminated. Thus, plaintiffs still need to establish that indeed the product consumed had the defect and could cause the damage alleged. Plaintiff Morales' evidence as to the product is that she learned about the recall through an unspecified news program. Ms. Morales' testimony is considered hearsay and may, as such, not defeat summary judgment. Additionally, mere reference to "contaminated milk" in an Amended Complaint, without evidence whatsoever, does not constitute competent evidence for summary judgment.

The FDA notices of October 28, 2010, (Docket No. 48–2, Exhibit A) also refer to Abbot's voluntary recall because of possible contamination. It refers that for those who may have consumed the product it will not cause long-term health problems as well as having not received any consumer reports of illness associated with the recalled formula.[6] As to reference to insect pieces that could irritate the gastrointestinal tract, if these had been present and ingested, the warning was that it could irritate the gastrointestinal tract, causing babies to have an upset stomach or refuse food. This averment was addressed by defendant's expert witness, Dr. Hyman.

---

4. Up to this point, with the limited evidence raised by plaintiff, the admission of the recall notices may have some weight as to plaintiffs' evidence to proof causation, for which reason the exclusion of these notices are discussed below.

5. A recall is "a firm's removal or correction of a marketed product that the [FDA] consid-

ers to be in violation of the laws it administers and against which the agency would initiate legal action." 21 C.F.R. § 7.3(g).

6. Exhibit B, FDA Notice of September 27, 2010; Exhibit C, *id.* Dated October 26, 2010; Exhibit D, *id.,* make same reference and wording as above Exhibit A.

Said reference to the FDA notices cannot be evidence of causation by referring to a possibility that infants who consume the formula containing beetles or their larvae could experience gastrointestinal discomfort and refusal to eat for plaintiffs lack a sufficient scientific foundation that, even if the formula was consumed by the infant, and even if the one consumed contained the alleged beetles, it caused the acute gastroenteritis that resulted in the September 2010 hospitalization of F.J.G.M. Abbot's expert, Dr. Hyman, explained only two (2) sources on which the FDA could have relied in issuing said statement, to wit, one was back in 1967 in reference to different species of beetle and another in an article in 1991 which referred to the 1967 case report. These two (2) referenced articles were not written or published by medical doctors nor in a peer-reviewed medical journal, and as such these referred sources are regularly excluded from evidence.

Plaintiffs' treating physician, Dr. Vargas–Raposo stated lacking elements to say that the infant's illness was indeed related to the recall of Abbot's powder milk. Dr. Vargas–Raposo further indicated in his deposition not knowing or not having heard of any child suffering gastroenteritis from eating insects and that he had no medical basis for believing that consuming a warehouse beetle can, in fact, cause gastroenteritis. (Docket No. 46–3, Dr. Vargas–Raposo's depo., pp. 86–87, 66–67). In fact, Dr. Vargas–Raposo refers that one of the causes of the gastroenteritis may be the ear infection. (Docket No. 46–3, Dr. Vargas–Raposo's depo., p. 86).

Lacking significant evidence as to causation with the absence of medical expert testimony, plaintiffs heavily rely on submitting the Abbot's recall notice and publication by FDA as to said recall of the infant formula, to which defendants have objected under federal rules of evidence.

Defendant Abbot submits the recall notices proposed by plaintiffs should not be allowed for these should be excluded under Federal Rules of Evidence 403 and 407.

Federal Rule of Evidence 403 states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Still, noticing that the probative value must be substantially outweighed by the danger of unfair prejudice, a district court does have its usual discretion to exclude the evidence if, as alleged, if its probative value is substantially outweighed by the danger of unfair prejudice. *See Bogosian v. Mercedes–Benz of North America, Inc.,* 104 F.3d 472, 481 (1st Cir.1997); *Raymond v. Raymond Corp.,* 938 F.2d 1518, 1523–24 (1st Cir. 1991). The appropriate inquiry under Rule 403, is whether the evidence results in "unfair prejudice." *See Swajian v. General Motors Corp.,* 916 F.2d 31, 34 (1st Cir.1990). " 'Unfair prejudice'... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R.Evid. 403 advisory committee's note.

Under said Rule 403, courts determine whether, as a matter of law, the probative value of the relevant evidence is substantially outweighed by unfair prejudice. 22 Wright & Graham, *Federal Practice and Procedure,* §§ 5214, 5221. *See McInnis v. AMF, Inc.,* 765 F.2d 240 (1st Cir.1985). The district court only has discretion to exclude evidence if the probative value is "substantially outweighed by unfair prejudice." A district court errs as a matter of law by never fully considering the probative value of the evidence and by never

making a determination that the evidence would result in "unfair prejudice." The relevant inquiry is whether the probative value is "substantially outweighed by unfair prejudice." *O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067, 1075 (1st Cir.1986); *Dollar v. Long Mfg. Co. N.C., Inc.,* 561 F.2d 613, 618 (5th Cir.1978).

Although clearly the recall letters/notices at issue are prejudicial and maybe highly so, it is still to be determined if these be considered *substantially prejudicial.* In the absence of evidence of causation and expert testimony by plaintiff, the reliance on the recall notices to establish negligence is substantial, for as defendant submits an unreasonable and unsupportable leap is required to conclude, without more, that because F.J.G.M. consumed the product and because it was the object of a recall, the product was indeed defective and the caused the injury.

Insofar as exclusion under Federal Rule of Evidence 407, said rule prohibits admission of evidence of subsequent remedial measures taken voluntarily by a defendant.[7] Warnings at the scene of an accident or on products or sending recall notices would also constitute subsequent remedial measures.[8]

Before recall letters or notices may be admitted, a sufficient foundation should be laid wherein plaintiffs ordinarily should present expert testimony that the type of defect which is the subject of the recall existed which caused plaintiff's incident.[9] Generally, a manufacturer's recall letters are insufficient to establish that the defect which was the subject of the recall was present in the particular product that caused plaintiff's injuries. See John M. Kobayashi, *Subsequent Remedial Measures and Recall Letters and Notices,* Product Liability 1989, Warnings, Instructions and Recalls (Practicing Law Institute 1989). Although some courts have excluded a manufacturer's recall letters on relevancy grounds, the majority of courts which have excluded recall documents have done so under Rule of Evidence 407.

Federal Rule of Evidence 407 excludes subsequent remedial measures when it provides that when measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction.[10] A breach of warranty claim may constitute negligence or culpable conduct of the kind this federal rule prohibits. *See Prentiss & Carlisle Co., Inc. v. Koehring–Waterous Div. of Timberjack, Inc.,* 972 F.2d 6 (1st Cir.1992); *Raymond,* 938 F.2d at 1522 (if Rule 407 applies, it prohibits evidence of subsequent remedial measures only "to prove negligence or culpable conduct in connection with the event.").

---

7. The word "remedial" means "intended for a remedy or for the removal or abatement of a disease or of an evil." Webster's Third New Int'l Dictionary 1920 (1993). The Black's Law Dictionary provides for "remedial" as an action intended to correct, remove, or lessen a wrong, fault, or defect. Black's Law Dictionary 2004 (9th ed.).

8. David P. Leonard, The New Wigmore: Selected Rules of Limited Admissibility s. 2.6.1, Interpretation of Term "Subsequent Remedial Measures."

9. When a plaintiff showed by independent evidence there was a defect in the product, the danger of admitting the recall letters is consider small. *Calhoun v. Honda Motor Co., Ltd.,* 738 F.2d 126 (6th Cir.1986).

10. *Rutledge v. Harley–Davidson Motor Co.,* 364 Fed.Appx. 103 (5th Cir.2010) (district court did not abuse discretion in excluding recall letter under Rule 407).

In view of the foregoing, this Magistrate Judge recommends to the Court to deny admission of the FDA notices and Abbot's recall notices under above evidentiary rule. Still, if the Court may allow submission in evidence of said recall and FDA notices, plaintiffs would still have to meet the hurdle of causation, which it lacks through medical expert evidence or any other reliable evidence.

## CONCLUSION

In view of the above discussed, it is recommended that defendant Abbot's Motion for Summary Judgment should be **GRANTED.** (Docket No. 44).

IT IS SO RECOMMENDED.

The presiding District Judge ordered the parties to file any objections to this Report and Recommendation in seven (7) CALENDAR days from the issuance of this Report and Recommendation, notwithstanding Amended Fed. R. Crim. P. 59(b)(2), term which expires on October 3, 2012. Failure to file same within the specified time waives the right to appeal this order. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–151 (1st Cir.1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986). *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir.1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

September 26, 2012